[Cite as *In re G.S.*, 2016-Ohio-1197.]

STATE OF OHIO )
)ss:
COUNTY OF SUMMIT )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

IN RE: G.S.
      J.S.

C.A. No.       27967

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 14-07-474
                    DN 14-07-475

DECISION AND JOURNAL ENTRY

Dated: March 23, 2016

---

CARR, Presiding Judge.

{¶1}    Appellant, Belinda C. ("Mother") appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her two minor children and placed them in the permanent custody of Summit County Children Services ("CSB").  This Court affirms.

I.

{¶2}    Appellant is the mother of G.S., born August 11, 2004, and J.S., born September 20, 2008.  The biological father of G.S. is Donald S. and the biological father of J.S. is Tim S.  Neither man is a party to this appeal.  At the time the current case began, the children were residing with Mother and Tim S.  Donald S. has had very little contact with the family over the years and no participation in these proceedings.

{¶3}    Before CSB initiated the present case, the agency had prosecuted two prior dependency cases against the family based on concerns of homelessness, substance abuse,

domestic violence, and an inability to provide for the basic needs of the children. *See In re G.S. & J.S.*, Summit C.P. Juv., Nos. DN 10-10-757 and DN 10-10-758 and *In re G.S. & J.S.*, Summit C.P. Juv., Nos. DN 12-10-661 and DN 12-10-662. Both earlier cases ended with a termination of protective supervision by the agency and a return of the children to the legal custody of Mother. The present matter was begun on July 23, 2014, with a complaint that alleged that the children were abused, neglected, and dependent. CSB claimed that Mother failed to properly supervise her children, failed to provide them with sufficient and nutritious food, was involved in criminal activity, and that the family had recently been evicted from its home. CSB also claimed that the children had witnessed domestic violence, drug use, and damaging of property in the home. Mother and Tim S. agreed to the emergency placement of the children with Megan S. ("Paternal Aunt"), the sister of G.S.'s father.

{¶4} The trial court adjudicated both children to be neglected and dependent, and additionally adjudicated J.S. to be abused by endangerment. Based on the testimony presented at the hearing, the trial court made several findings of fact. First, the trial court found that police were alerted to a car parked in Barberton, containing Mother and J.S. in February 2014. Mother was reclined in the front seat and J.S. was awake in the back. J.S. unlocked the door for the officer and complained of the cold. He had no coat or shoes. The police officer had difficulty rousing Mother, and her explanation that she was waiting for a friend to get off work in Ravenna made no sense to the officer. The police permitted Donald S.'s father to retrieve the child. Second, the trial court found that police responded to a call on May 25, 2014, that a man, later determined to be Tim S., was hiding in the bushes and claiming that his wife had stabbed him. Tim S. also claimed that he and Mother had argued about Mother smoking methamphetamine. The police observed him "to be under the influence" based on his rapid and incoherent speech,

constricted pupils, and inability to stand still. Third, the trial court found that the police responded to a call four days later, on May 29, 2014, involving Mother, Tim S., and three others. They had apparently been arguing about drug paraphernalia. Tim S. ran away and when found by police, he claimed that Mother told him to run away with drugs she had given him. Finally, the trial court found that paternal grandfather, the father of Donald S., had permitted Mother and the children to stay with him in June 2014, when they had no other place to stay. When the grandfather denied Mother the use of his car, she "punched him" and took the car. The car was later found to have been damaged and the word "pervert" scratched into it. Based on these facts, the trial court concluded that CSB had sufficiently established domestic violence, transient housing, and irrational behavior by Mother and Tim S., along with the likelihood that such behavior was caused or aggravated by drug abuse.

{¶5} Following the dispositional hearing, temporary custody was granted to the agency and CSB continued the placement of the children with Paternal Aunt. The court appointed independent counsel to represent the children because their wishes conflicted with the recommendation of the guardian ad litem. *See In re B.W.,* 9th Dist. Medina No. 12CA0016-M, 2012-Ohio-3416, ¶ 41, citing *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, ¶ 17-18, 29. The guardian ad litem recommended that neither child should be returned to their parents. According to the attorneys appointed to represent children, G.S.'s preference was to live with his father, Donald S., and his brother, while J.S.'s preference was to live with Mother. If placement with those parents did not work out, the attorneys reported that both boys would choose to live with Paternal Aunt along with their brothers. Both boys were said to be happy and well-adjusted to living with Paternal Aunt.

{¶6} The trial court adopted a case plan which required the parents to (1) provide for the basic needs of the children by becoming more financially stable, maintaining safe and stable housing, providing proper nourishment, providing clean clothing, and assuring consistent school attendance; (2) participate in therapeutic counseling for domestic violence and violent relationships; and (3) complete a chemical dependency evaluation and follow all recommendations, including random drug tests at the request of CSB and/or the assessor. The children and their caregiver were to engage in counseling and the caregiver was to follow recommendations for parenting, interaction, and dispensing medications. Weekly visitation was offered to Mother and Tim S. at the visitation center, and Mother was offered additional visits under the supervision of Paternal Aunt.

{¶7} On February 25, 2015, CSB moved for permanent custody of the children. Following a hearing, the trial court granted permanent custody to CSB and terminated the parents' parental rights to the children. Mother has appealed and has assigned one error for review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT AWARDED PERMANENT CUSTODY OF THE CHILDREN TO SUMMIT COUNTY CHILDREN SERVICES BASED ON THE INTERESTS OF THE CUSTODIAN AND NOT THE BEST INTERESTS OF THE CHILDREN.

{¶8} Mother contends the trial court erred in granting permanent custody to CSB and claims it should have granted legal custody to Paternal Aunt instead. For the reasons that follow, this Court finds Mother's argument to be without merit.

{¶9} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶10} The trial court made two first prong findings in this case: (1) the children could not or should not be placed with either parent within a reasonable time; and (2) the children had been adjudicated abused, neglected, or dependent on three separate occasions. *See* R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(e). In support of the finding that the children could not or should not be placed with either parent within a reasonable time, the trial court found that Mother and Tim S., J.S.'s father, had not remedied the conditions that brought the children into care. *See* R.C. 2151.414(E)(1). The court also found that Donald S., G.S.'s father, had demonstrated a lack of commitment to his son. *See* R.C. 2151.414(E)(4). Mother has not challenged the first prong findings of the trial court. Rather, Mother challenges only the finding that permanent custody was in the best interest of the children, and she asserts that an award of legal custody to Paternal Aunt would have been in the best interests of the children instead. *See* R.C. 2151.414(D)(1)(a)-(e).

{¶11} When determining whether a grant of permanent custody is in the children's best interest, the juvenile court must consider all relevant factors, including those enumerated in R.C. 2151.414(D)(1): the interaction and interrelationships of the children, the wishes of the children, the custodial history of the children, the children's need for permanence in their lives, and whether any of the factors in R.C. 2151.414(E)(7)-(11) apply. *See In re R.G.*, 9th Dist. Summit Nos. 24834 & 24850, 2009-Ohio-6284, ¶ 11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3, (Jan. 2, 2002).

**1.  The personal interactions and interrelationships of the children**

{¶12} The two boys share a very close bond, and their most important relationship is with each other. They consistently expressed a desire to live together and a concern that they might be separated. The guardian ad litem emphasized that the two boys love each other and are very protective of each other. Caseworker Christina Kist testified similarly and stated her belief that it is very important that they be kept together.

{¶13} As far as the children's relationship with Mother, Caseworker Kist testified that the boys love her and they are all very affectionate with each other. The guardian ad litem said that they were always happy to see each other at visits and she believes there is a bond between them. During visits, they sat together on a couch and played video games, laughed and joked. The guardian ad litem did not see Mother bring any snacks, food, or gifts to visits.

{¶14} At the permanent custody hearing, Mother testified that she had three jobs: driving a tow truck to haul junk cars, working at an auto parts store, and working at a pizza place. She described the tow truck work as "sporadic." She stated that her children are very

well-mannered, polite, and have great values, and she takes credit for them being as kind as they are. She took "a hundred percent responsibility" for their exposure to domestic violence and everything that has affected them. At the same time, she refused to credit much of the negative evidence presented by CSB. The record reveals convictions for disorderly conduct on September 11, 2013, criminal damaging on February 18, 2015, and assault and unauthorized use on February 18, 2015. She claims the assault against the grandfather was self-defense, and she is appealing the conviction. Mother denies that she damaged the grandfather's vehicle and believes he only wanted her to be incarcerated so that Paternal Aunt could get custody of the boys. Mother denies being passed out in a car with J.S., who was unprepared for the cold weather. Rather, she claims she fell asleep. She claims that she completed drug tests for the last six or seven weeks, while apparently conceding that she completed no drug tests until that late date. At the same time, she admits that drug usage has been a concern throughout the case and that she did not complete a substance abuse evaluation as required by her case plan.

{¶15} The boys have resided with Paternal Aunt for a year since July 2014. Caseworker Kist testified that neither Mother nor Tim S. expressed dissatisfaction with the care provided to the children by Paternal Aunt. The children's therapist believes the boys have a very positive and loving relationship with Paternal Aunt. The therapist said Paternal Aunt articulates appropriate boundaries and appears to be affectionate and involved with the boys.

{¶16} Paternal Aunt testified at the permanent custody hearing. She stated that she has sufficient income and space in her home to meet the needs of the boys. She said that she and the boys get along well and love each other. She recently took the boys on a vacation to Disneyworld where G.S. had his 11th birthday. She said the boys enjoy her home and her pet dogs, and they have a lot of friends. She testified that since being placed with her, G.S. has done

very well in school and is very excited about his grades. His self-esteem has improved. J.S. has overcome shyness, is much more talkative, and has developed more self-confidence. She indicated that she was committed to following through with counseling for the children and believed counseling with a third-party has helped them.

{¶17} The children are said to have relationships with several members of their extended family, and there is evidence before the trial court that Paternal Aunt would maintain those relationships. The boys have a good relationship with Mother's parents and with Mother's third child, who resides with Mother's parents. Paternal Aunt has a close relationship with Mother's parents as well and explained that they all get together for family celebrations. The guardian ad litem believes it is important for those relationships to continue and believes Paternal Aunt would continue them even if permanent custody is granted and she is permitted to adopt the boys as she would like. The guardian ad litem added that future visits with Mother would be beneficial to the boys "[u]nder certain circumstances" and believes Paternal Aunt would allow such visits if she felt the conditions were safe and appropriate. In addition, Paternal Aunt has kept the boys involved with her own parents (G.S.'s paternal grandparents) and her cousins.

{¶18} The record contains some evidence about the boy's relationships with their fathers. J.S. has said that he misses Tim S., his biological father. The record reveals that Tim S. completed a drug evaluation through the probation department and participated in a halfway-house program in mid-2015. When he was released from that program, he was to meet with the caseworker about seeing his son again, but he failed to keep his scheduled appointment and he failed to respond to her follow-up messages.

{¶19} G.S. has not seen his father, Donald S., for two years. G.S. rarely mentions his father, but wishes he could spend time with him. He recalls the times he did spend with him and

the fun he had. Paternal Aunt, who is Donald S.'s sister, and the caseworker each attempted to reach him to arrange visits, but they were unable to make contact with him.

**A. Therapy of the children**

{¶20} In the course of reporting the relationships between the children and relatives, it is important to also consider the testimony of Ruth Freeman, the licensed social worker at Guidestone who provided in-home therapy to the children for almost a year before the permanent custody hearing. Ms. Freeman explained that the boys were evaluated and treatment plans were constructed for them. G.S.'s treatment plan focused on helping him deal with anxiety related to the trauma he experienced while living with Mother and Tim S. G.S. told the therapist that he had witnessed domestic violence between Tim S. and Mother, particularly reporting that Tim S. woke Mother up by hitting her with his fist and also hit her on other occasions. G.S. told the therapist that he was "scared" for Mother, and he tried to make her feel better by making her laugh. He also witnessed name-calling between Mother and Tim S. J.S.'s treatment plan focused on dealing with the emotional issues caused by the removal from his home, and his adjustment to the placement with Paternal Aunt.

{¶21} The therapist testified to what she learned about the family's existence prior to removal of the children. The family had to move multiple times, and G.S. has always tried to take care of his younger brother. He helped feed him and take care of him when the boys were left alone at night or when Mother was asleep during the day. Both boys said they were occasionally hungry and food was "minimally provided." The boys mostly ate ramen noodles, cereal, and hot dogs, which G.S. could prepare. They were said to be getting regular and more varied meals now with Paternal Aunt, including vegetables and smoothies, which they liked. The therapist believes it is important that the boys continue in counseling.

**B. Suspended visitation**

{¶22} The therapist explained that the boys personally withdrew and regressed in their treatment as a result of Mother's broken promises and their inconsistent attendance at visits. She reported that the children exhibited trauma-like behavior after Mother's missed visits. The caseworker also observed the children's disappointment when Mother missed visits. Because of these reactions, CSB requested that Mother call to confirm her visits to avert the necessity of transporting the children forty minutes to the visitation center only to be disappointed. Mother failed to comply with the request and also failed to attend a meeting she herself had requested with CSB regarding the request.

{¶23} Therefore, on January 1, 2015, CSB moved to amend the case plan to suspend visits. The magistrate granted the motion, observing that the parents had not complied with "any case plan services." The magistrate found the suspension of visits to be in the best interests of the children until there was some case plan compliance that would demonstrate a commitment to consistent and appropriate visits. The magistrate ruled that visits could be resumed upon agreement of the guardian ad litem and the caseworker or upon further court order. An amended case plan, reflecting the court-ordered suspension of visits, was adopted by the trial court.

{¶24} On July 31, 2015, shortly before the permanent custody hearing, the court denied a motion to reinstate visits. The court found that psychological harm could result to the children if visits resumed prior to the determination of the motion for permanent custody. The court emphasized that it was relying upon information from the children's therapist that the boys had suffered serious neglect and abuse while in Mother's custody and that the therapist was only able to make progress in addressing the trauma issues after the visits with Mother had ceased. The

court concluded that it was in the best interests of the children that visits not be reinstated before permanent custody was addressed.

## 2. Wishes of the children

{¶25} As explained by their independent counsel, J.S.'s first preference is to live with Mother, while his second choice is to stay with Paternal Aunt and his older brother, and G.S. would like to live with his father, Donald S., while his second choice is to reside with Paternal Aunt provided his younger brother is there.

{¶26} The guardian ad litem had worked with the family for three and one-half years during this case as well as the prior case. She believes that permanent custody is in the best interest of the children so that they might be able to reside in a stable, healthy, and productive environment. She does not believe Mother has fully remedied the concerns of domestic violence, employment, or substance abuse, and does not believe the parents are capable of providing consistent care to the children. She believes that both children are happy in the care of Paternal Aunt.

## 3. Custodial history

{¶27} The children resided with Mother and Tim S. when the present case began, but the record is not clear as to how long they had resided with them. Since the initiation of the present case, the children have resided with Paternal Aunt, approximately fourteen months until the permanent custody hearing. Without providing dates, the caseworker testified that the boys have recently lived with Mother, Tim S., Tim S.'s mother, Donald S.'s father, and Paternal Aunt. Paternal Aunt testified that she and her father often took care of the boys on weekends while they were growing up. She also explained that she had occasional placement of the children during the previous dependency cases.

## 4. Legally secure permanent placement

{¶28}  There was evidence before the trial court that the children were in need of a legally secure permanent placement and that it could only be achieved by an award of permanent custody.  The family was aware of the children's situation, but no relatives sought legal custody and there were no motions for legal custody before the trial court.

{¶29}  Caseworker Kist testified that she believes permanent custody is in the best interest of G.S. and J.S.  She does not believe that the parents have remedied the safety issues identified at the beginning of the case, nor does she believe that they could do so within a six-month extension.  The guardian ad litem similarly believes that Mother cannot provide an appropriate home for the children and that she has failed to fully address domestic violence, employment, and chemical dependency issues.  Further, she believes Mother has not accepted responsibility for the actions that caused the boys to come into care.

{¶30}  Mother argues that the trial court should have granted legal custody to Paternal Aunt instead of granting permanent custody to the agency.  In so doing, she claims that "inappropriate consideration was given to the wishes of the Aunt."  In support of her argument, Mother points to the caseworker's statement that the agency would have supported an award of legal custody to Paternal Aunt.  However, the caseworker specifically conditioned her statement upon Paternal Aunt's willingness to accept legal custody.  In fact, the caseworker explained that, once Paternal Aunt learned what legal custody meant, she consistently and adamantly maintained that she wanted to pursue adoption and not legal custody.

{¶31}  Paternal Aunt confirmed that position in her own testimony.  She explained that she had looked into the alternatives available to her as a caregiver.  Her expressed desire is that, rather than seeking legal custody of the children, she wants "to be able to adopt them."  She

believes that, in that way, she can provide them with a home that is "safe and healthy." In stating that she is willing to consider future contact between the boys and their parents, she wants to ensure that those relationships are healthy and that any contact be conducted in a safe and secure setting.

{¶32} Paternal Aunt's position is further supported by record evidence that the caseworker had to intervene into the relationship between Mother and Paternal Aunt during the trial court proceedings. Mother accused Paternal Aunt of "stealing" her children and Paternal Aunt complained that Mother texted her in the middle of the night and was verbally abusive to her. Paternal Aunt was not willing to accept legal custody of the children given these circumstances.

{¶33} The Ohio Supreme Court has explained that in considering an award of permanent custody, the juvenile court need not determine that the termination of parent rights was "the only option." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 64 (2006). Nor must the court find that no suitable relative was available for placement. *Id.* Rather, R.C. 2151.414 requires that the juvenile court weigh all the relevant factors and "find the best option for the child." *Id.* "The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* Moreover, in the absence of any friends or relatives seeking legal custody, that was not an option available to the trial court. *See In re S.R.T.*, 9th Dist. Summit 27978, 2016-Ohio-788, ¶ 28. Accordingly, Mother's argument that the trial court should have granted legal custody to Paternal Aunt is without merit.

{¶34} Mother's sole assignment of error is overruled.

III.

**{¶35}** Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

MOORE, J.
HENSAL, J.
CONCUR.

APPEARANCES:

RANDALL C. BRAY, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.